(Decided June 28th, 1866.)

---

THE MARYLAND FIRE INSURANCE COMPANY vs. WILLIAM F. DALRYMPLE; AND, WILLIAM F. DALRYMPLE vs. THE MARYLAND FIRE INSURANCE COMPANY.—CROSS APPEALS.

PLEADING: PRACTICE.—W. F. D. sued the Insurance Company for damages for the sale and conversion, by the defendant, of certain shares of the stock of the Baltimore and Ohio R. R. Co., which the plaintiff had pledged to the defendant to secure the re-payment of a sum of money lent to him by the defendant. The *nar.* originally filed contained a single count in *trover:* the defendant pleaded and issue was joined. Afterwards an agreement was filed, "that in lieu of formal pleadings the plaintiff should be considered as having amended his declaration by adding such counts *in tort* as the state of facts, as they appear at the trial,

would justify;" and the same same agreement was made as to pleas and replications and issues thereon,—"the case to be tried on the pleadings as they now stand, all errors in pleading on both sides released, with leave to each party to give the special matter in evidence," reserving to each party, in case of appeal, the same benefit of exceptions "as if formal pleadings had been put in.—HELD:

That under the agreement, the plaintiff, in his amendments, was confined to his counts *in tort*, and the suit must be dealt with as an action *ex delicto*, and as if the supposed amended counts in that form were added.

CONTRACT,—CONSTRUCTION OF: BAILMENT: NOTICE: SALES OF STOCK AT BROKERS' BOARDS: PERSONS HOLDING FIDUCIARY RELATIONS INCOMPETENT TO PURCHASE AT THEIR SALES OF TRUST PROPERTY: PLEDGOR OR PLEDGEE WITHIN THE RULE: THE RULE WHEN ENFORCED AT LAW AND WHEN IN EQUITY: TORTIOUS CONVERSION: ELECTION: TENDER: ACTION EX DELICTO AND EX CONTRACTU,—WHEN PROPER: RECOUPMENT.—W. F. D. obtained from the Maryland Fire Insurance Company a loan of $19,500 returnable, by agreement between them, upon one days' notice, and deposited as collateral security, for the payment of the same, 325 shares of the stock of Balto. & Ohio Rail Road Co., with the understanding, that "if the said loan was not promptly paid according to agreement, the company was authorized, without further notice, to sell the said collaterals for payment of the debt,—any excess or deficiency to be paid or received by him, as the case may be," &c. It was further agreed, that the interest should be payable every sixty days, if the loan continued beyond that time. From the 12th of June to the 15th of November, 1850, the stock varied in price from $79 to $56¼ per share. On the 30th of October, notice was given by the defendant to the plaintiff to return the loan on the 1st of November, 1860; on the 10th of November, 1860, a notice "to return nine thousand dollars of the loan," on Tuesday, the 13th inst.; and on the 13th of November, a notice "to return the whole of said loan, $19,500, on to-morrow, the 14th inst." On the 20th of November, the defendant procured the stock to be sold at the Board of Brokers, and became the purchaser thereof at $55 per share. The stock was held by the defendant till the spring of 1862, when it was sold publicly at the Board of Brokers, fairly and in the usual way, in parcels, to different persons, at prices ranging from $60 to $67 per share,—the ruling market prices. On the 27th of October, the defendant received a dividend of $3.00 per share on the stock, and handed the same to the plaintiff, and on the 16th of April, 1861, received a similar dividend and retained the same. Interest was paid on the loan, by the plaintiff, to the 1st of November, 1860. On the 16th of December, 1862, the plaintiff tendered to the defendant the sum loaned,

with interest, and demanded a return of the stock, but the defendant declined the tender and refused to return the stock, saying that the same had been sold. Proof was offered (subject to exception) that at the time of the tender the stock was worth about $78 per share, and at the time of the trial it was worth $115 per share; and proof was offered by the defendant that on the 20th of November, 1860, the stock was worth but $55 per share, and on the 25th of April, 1861, sold as low as $41.50 per share.—HELD:

1st. That the notice given on the 13th of November was sufficient, under the contract, to entitle the defendant to sell on the 20th.

2nd. That by the words of the agreement authorizing the defendant, upon default, to sell without further notice, it is to be understood, that when the power to sell arose, all notice of the time and place of sale was waived and dispensed with by the plaintiff, leaving upon the defendant the obligation to sell publicly and fairly for the best price he could obtain.

3rd. That a sale at the Board of Brokers, publicly and fairly made, would have been legal and valid, and if the sale of the 20th of November had been made to a third person it would have been a legal sale under the contract, vesting a good title in the purchaser and terminating the bailment.

4th. The doctrine, that persons holding fiduciary relations are incompetent to purchase the property held by them in trust, "is not confined to a particular class of persons, such as guardians, trustees, or solicitors, but is a rule of universal application to all persons coming within the principle that no party can be permitted to purchase an interest where he has a duty to perform inconsistent with the character of a purchaser."

5th. This rule rests upon grounds of public policy, and is enforced without regard to the question of *bona fides* in the particular case; and it is clear, both upon reason and authority, the case of pledgor and pledgee comes within the rule.

6th. While in cases of pure trust, resort to a Court of Equity must be had for relief, and that Court will grant relief where there are special circumstances requiring such interference in cases of *quasi* trusts, yet, the relation of pledgor and pledgee, being a legal relation, its rights and duties are defined by law, and the remedies for the violation of such duties are ordinarily in a Court of Law.

7th. The sale of the pledge by the defendant to itself was contrary to the faith of the bailment, forbidden by the common law, and might have been treated by the bailor at his election as a tortious conversion of the property, but no such election having been made by the plaintiff, there was no such conversion.

8th. That the sale of the 29th of November did not operate either to vest the title in the defendant as purchaser, or to work a conversion of the stock. The bailment continued, and if nothing more had been done subsequently, and the stock had remained in the defendant's possession, there can be no doubt that the tender and demand made on the 16th of December, 1862, would have been valid, and the refusal on the part of the defendant at that time would have given a good cause of action to the plaintiff.

9th. That the sale of November the 20th, 1860, being inoperative, and the plaintiff continuing in default, the power to sell conferred by the contract still continued, and was, in fact, executed by the sales made in 1862. By those sales the bailment was ended, and there being no violation of the contract on the part of the defendant, nor any tortious conversion of the stock, the plaintiff was not entitled to recover in this form of action.

10th. That the plaintiff would have the right to recover in an action *ex contractu*, any excess which might remain in the hands of the defendant arising from the proceeds of the sales of stock in 1862, including the dividend received on the 16th of April, 1861, with which the defendant would be chargeable, after deducting the amount of the loan and interest due at that time; such excess would be simply money had and received by the defendant to the use of the plaintiff, under and in conformity with the contract.

CROSS-APPEALS from the Superior Court of Baltimore city.

This action was brought by William F. Dalrymple against the Maryland Fire Insurance Company, in the Superior Court of Baltimore city, (MARTIN, J.,) on the 31st of December, 1862. The *nar.* first filed contained a single count in *trover*. After plea and issue joined, it was agreed between the parties, that the plaintiff should "be considered as having amended his declaration by adding such counts in *tort*, as the state of the facts, as they appear at the trial, would justify." The facts of the case are stated in the opinion of this Court. The verdict and judgment of the Court below were in favor of Dalrymple. Both parties appealed from the rulings of the Court below upon their respective prayers.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH and WEISEL, J.

*S. T. Wallis* and *Wm. A. Fisher*, for the Maryland Fire Insurance Company:

1. Whatever view may be taken of the circumstances of the sale of November 20th, 1860, and the purchase by Mr. Spence on behalf of the appellant, that sale, in a Court of Law, is voidable only, and not void. This principle has been distinctly affirmed with reference to all sales where any *fiduciary* relations whatever are imposed upon the vendor, and is broad enough to cover a sale by a pledgee as well as that by a trustee or executor. In fact the whole doctrine with reference to the impropriety of purchases by pledgors at their own sales is the out-growth of equitable principles. *Williams' Ex. vs. Marshall,* 4 *G. & J.,* 376. *Lester vs. Lester,* 6 *Vesey,* 631, (*a.*) 1 *Parson's on Contracts,* 87, note (*o,*) *new Edition.* 1 *Story's Eq.,* sec. 323. *Story on Bailments,* sec. 319. *Parson's on Contracts, Book I, ch. III. Mason vs. Martin & Kemp,* 4 *Md. Rep.,* 124. *Edwards on Bailments,* 255.

2. That even if a party holding a fiduciary relation to the thing sold cannot, under ordinary circumstances, be both vendor and vendee, even at law, such a rule does not apply to a case like the present where the trust is for the benefit of each party himself, as well as his principal, and where it may be essential to the effectiveness of his security, that he should have the right to buy at a low price himself with a view to a prospective rise, rather than suffer his interests to be sacrificed by a sale to a third party below the amount of the debt. This question is included in the appellant's 1st prayer.

3. Mr. Dalrymple having failed to respond to the demands made upon him in accordance with the contract, the stock was sold publicly at the Board of Brokers, on the 20th Nov. 1860, by a broker, and the purchase was made in the usual manner by another. It is not denied that this sale was *bona fide* and clear of any imputation of fraud in fact, and it is proven that the stock was sold at the highest price obtained

for the stock on that day. Mr. Dalrymple was at once notified of the sale and of the prices, and made no objection whatever until more than two years afterwards, when the stock, after a period of great depression, was selling in the market at a higher price than that at which the loan had been made, and when the appellant, having thus reason to believe that Dalrymple had assented to the sale, had re-sold the stock and parted with all control over it. It is submitted that under these circumstances the sale and purchase were "valid and binding in law."

4. The notice given on the 13th of November, 1860, requiring Mr. Dalrymple to return the money loaned on the following day, was "one day's notice" under the terms of the contract, and gave to the appellant a right to insist upon payment on the 14th. 1 *Robinson's Practice*, 437.

5. Even if the notice of November 13th, 1860, was insufficient to enable the appellant to require payment on the 14th, it was sufficient notice to Mr. Dalrymple of the appellant's demand, and would support a sale made on the 20th, because of failure on the part of Mr. Dalrymple to pay in the interval between the 14th and 20th.

6. The notice of November 5th was based upon a clause of the contract other than that upon which the notice of the 13th was founded, and was itself sufficient to support the sale of the 20th.

7. If the sale of November, 1860, could be treated as void for all purposes in this suit, the sales made in the spring of 1862 were within the power of the appellant, and put an end to the relations between the parties. *Willoughby vs. Comstock*, 3 *Hill*, 389.

8. If the sale and purchase in November, 1860, cannot be supported, they constituted an "illegal assumption of the property and right of disposal" of the stock, and, therefore, a conversion, the effect of which was at once to break up the

relation of bailor and bailee, and vest in the bailee an imme-
diate right of action. *Jones on Bailments,* 118. *Riseley vs.
Pyle,* 11 *M. & W.* 19. *Granger vs. George,* 5 *Barn. &
Cres.,* 149. *Bradley vs. Copley,* 1 *Com. Bench,* 50 *Eng. C.
L. Rep.,* 685. *Fenn vs. Biddleton,* 8 *Eng. L. & E. Rep.,*
483.

9. It is quite clear that in an action of *assumpsit,* the 20th
of November would be treated as the day on which the breach
of contract was committed, and, Mr. Dalrymple having
received from the appellant an equivalent for the stock
pledged, the value would be fixed as of that day. *Williams,
&c. vs. Woods, Bridges & Co.,* 16 *Md. Rep.,* 245, 246, 258,
259. *Shaw vs. Holland,* 15 *M. & W.,* 145.

10. It is equally clear that in an action of *trover,* the con-
version would be fixed as of the 20th of November, and could
not be brought forward by a demand for the stock and refu-
sal by the appellant, when it had previously parted with the
stock, and the value would be fixed as of the 20th. *Dietus
vs. Fuss,* 8 *Md. Rep.,* 158. *Edwards vs. Hooper,* 11 *M. &
W.,* 363. *Granger vs. George,* 5 *Barn. & Cress.,* 149. *Stir-
ling vs. Garritee,* 17 *Md. Rep.,* 468. *Detinue* would not be
an appropriate action. 1 *Selw. N. P.,* 662, 663, 664. 1
*Saund. Pl. & Ev.,* 956.

11. In an *action on the case,* the gist of the action must
still be the conversion. A mere demand and refusal based
upon a contract to keep and return a pledge cannot be made
the basis of an *action on the case*—the cause of action in such
a case would be, not the refusal to deliver, but not the breach
of the common law duty to keep, arising out of the contract,
and the only breach which could be made the inducement
for the count in *case* would be that of the *duty to keep,* and
that breach had occurred prior to the demand, and on the
20th of November. If this view be correct, the supposed
count in *case* can only relate to the breach of duty on the

20th, and Mr. Dalrymple being in a condition to go into the market and indemnify himself, the value would be fixed as of that day. The action on the case can be made applicable only to some *tort* extraneous to, though arising out of, the contract relations of the parties, and not to a mere naked breach of contract, such as a refusal to deliver on request. *Cobbett vs. Packington*, 6 *Barn. & Cres.*, 268. *Orton vs. Butler*, 5 *Barn. & Ald.*, 652. 1 *Chitty's Pl.*, 134. *Jones on Bailments*, 118.

12. There is, in point of fact, no distinction between *case* and *trover* as to the time at which the value is to be fixed, when the gist of the action is the same. *Trover* is a branch of the action on the case, and in Maryland, exemplary damages may be had upon a proper state of facts in that action. *Granger vs. George*, 5 *Barn. & Cress.*, 149, presents a case in which there was a count in case, as well as one in *trover*, and a conversion having occurred in 1818, and demand and refusal in 1824, it was held, that the conversion was the gist of the action, and that the plea of limitations was an answer to both counts. *Cromwell vs. Owings*, 7 *H. & J.*, 60. *Edward vs. Hooper*, 11 *M. & W.*, 363. *Fishwich vs. Sewell*, 4 *H. & J.*, 393. *Clark's Adm'r vs. Marriott*, 9 *Gill*, 338.

13. The appellee, was himself, in default on the 20th of November, and continued in that attitude up to the date of his tender in December, 1862; he was in possession, on that day, of money of the appellant more than sufficient to purchase in the market the number of shares pledged by him, and could have done so down to a time shortly preceding the demand. In this aspect of the case, the measure of damages should not exceed the value of the stock on the 20th of November, and interest, diminished by the debt and interest. *Cainsford vs. Carroll*, 2 *Barn. & Cres.*, 624, (9 *Eng. C. L. Rep.*, 204.) *Shaw vs. Holland*, 15 *M. & W.*, 136.

14. The debt due the appellant is properly to be recouped from the recovery, whatever that may be. *Story on Bailments,* sec. 349. *Jarvis vs. Rogers,* 15 *Mass.,* 389. *Stearns vs. Marsh,* 4 *Denio,* 227. *Ward vs. Tellers,* 20 *Wend.,* 288. 11 *Howard,* 475. 4 *H. & J.,* 430. 3 *Parsons on Cont.,* 196 and 202.

15. That even if the first sale was invalid at law, the subsequent sales were valid under the original notice, Dalrymple having continued in default, and being valid, there was no *tort* committed, and if there was a balance in the appellant's hands from such sales and from dividends, it was not recoverable in the form of action here adopted, but could only have been recovered as money had and received. This point is raised by the appellant's 5th prayer.

*Thos. S. Alexander* and *Wm. Schley,* for Dalrymple, argued:

1. That the sale by the defendant, through the agency of one broker to itself purchasing through the agency of another broker, was contrary to its duty as pledgee, and did not alter the property in the pledge so attempted to be sold and purchased. Hence, the stock pledged still remained, after such pretended sale, in the hands of the defendant, subject to redemption by the plaintiff; and the demand made for return thereof, on the 16th of December, 1862, with the tender of the loan for security whereof the deposit was made, completed the right of action of the plaintiff.

Authority will not be required for the purpose of showing that a pledgee, or other person, standing in a fiduciary relation, cannot sell to himself the thing pledged or intrusted to him for the purpose of sale. It will, therefore, be incumbent on the defendant to show some specialty which is to prevent the application of the rule in this case.

2. The rule has been adopted for the prevention of fraud, and to enforce the obligations of good faith; and the application of the rule is not to be defeated by proof that the sale

was fairly made and at a full price. The appropriation by a fiduciary, to his own use, of property which has been confided to him for the purpose of sale, under pretext of a sale to himself, is contrary to his duty and fraudulent in construction of law, and it is at the election of the party aggrieved to adopt such sale or to repudiate it.

3. Where the trust is a pure trust, the execution of which belongs to a Court of Equity, the parties aggrieved must necessarily resort to equity for relief against every breach of duty on the part of the trustee. And in many cases of *quasi* trust, equity has interfered in order to afford the party a better remedy than he could have obtained at law. But the relation of pledgor and pledgee is a legal relation. The rights and duties resulting from such relation are defined by law. And the remedy for a breach of duty, on the part of either party, if susceptible of compensation in damages, is to be found only in a Court of Law. 2 *Story's Equity*, sec. 1032, to show that pledgor cannot go into equity to redeem except under special circumstances. *Hasbrouck vs. Vandervoort*, 4 *Sandf. S. C.*, 74. *Mark vs. Lawrence*, 5 *H. & J.*, 64, is a direct authority that a sale by a fiduciary to himself may be avoided at law. *Singstuck vs. Harding*, 4 *H. & J.*, 186. *Middlesex Bank vs. Minot*, 4 *Metc.*, 325. *Bank vs. Dubuque R. R. Co.*, 8 *Clark* (*Iowa*,) 278. *Swayn vs. Stephens*, *Cro. Car.*, 245, 333.

4. If the sale of the pledge, by the pledgee to itself, was a tortious act, and contrary to the faith of the bailment, then it could operate no conversion of the pledge save at the election of the pledgor. But if the latter is at liberty to repudiate that colorable sale, upon what principle is it that his damages, to be recovered for a subsequent conversion, are to be measured by the price affected to be given on the occasion of the first sale? It would involve contradiction to deny that the sale binds the right of the pledgor in the property, and to affirm, at the same time, that it determines the extent

of his recovery for the loss of his interest in that property. It is denied, therefore, that the damages of the plaintiff are to be measured by the price given or value of the stock in November, 1860.

5. The sales made in the spring of 1861, did not operate a conversion of the pledge, since no notice whatever was given to the pledgor of the time and place of sale, or even the purpose of the pledgee to make sale of the pledge. On the contrary, the pledgee assumed the stock had been validly disposed of by the transactions of 1860. That the pledgor is entitled to notice of the time and place of sale, is shown by 2 *Story Eq.*, § 1033. *Washburn vs. Pond*, 2 *Allen*, 474. *Wheeler vs. Newbold*, 16 *New York*, 393.

6. It is to be assumed, therefore, that the conversion was made on the 16th of December, 1862, and the lowest assessment of damages must be the value of the stock on that day, agreeably to the Court's instruction. In support of which reference is made to *Hepburn vs. Sewell*, 5 *H. & J.*, 211. *Stirling vs. Garritee*, 18 *Md. Rep.*, 468.

7. But, under the circumstances of the case, it was competent for the jury to assess damages according to the highest value of stock on the day of trial, or on any other day before that day, and after the day of demand and refusal.

Where property comes into the possession of a party accidentally—without force or fraud—and is converted by him under a fair color of title, the measure of damages ought to be the sum realized by such conversion, or the current value in the market of the property converted. But where the defendant acquires the possession from, or in privity with, the title of the plaintiff, and the conversion is an act of bad faith, in such case, the measure of damages is not limited to the actual value of the property at the time of conversion, but may be aggravated to the full value thereof at the time of trial, or at any intervening period. *Cromwell vs. Owings*, 7

*H. & J.*, 60. *Harker vs. Dement*, 9 *Gill*, 17. *Bosley vs. Reynolds*, 8 *A. & E.* (*N. S.*,) 779. *Greening vs. Wilkinson*, 1 *C. & P.*, 625. *Martin vs. Porter*, 5 *M. & W.*, 352. *Fisher vs. Prince*, 3 *Bun.*, 1363. *Whitten vs. Fuller*, 2 *Bl.*, 602. *Cortelyon vs. Lansing*, 2 *Caines Cases*, 200. *West vs. Beach*, 3 *Cowen*, 82, *Wilson vs. Matthews*, 24 *Barb.*, 295. *Harger vs. McManus*, 6 *Watts*, 418. *Backenstoss vs. Stakler*, 33 *Penn.*, 251.

In equity, the *cestui que trust* may recover the specific property from the trustee, or any person claiming under him with notice of the trust; or may, at his election, claim the value realized by the misapplication; or may pursue the value or equivalent throughout its mutations into other properties.

The principle on which this equity is administered is, that the trust fastens itself on the property, and substantial justice demands that the *cestui que trust* shall have his specific property, or all the profits which the trustee may or might have realized by a misapplication of the property. The same principle applies with yet greater force to the case where a pledgee, in fraud of the bailment, withholds the pledge, or delivers it to another. The pledgor ought to have a return of the thing pledged, or the highest value which could have been realized therefor, either by the pledgee or the person to whom it may have been wrongfully delivered. The pledgor is not bound to show that such highest value was actually realized, nor is the pledgee to be permitted to show that the sum realized, by his breach of faith, falls short of such highest value.

In an action for non-delivery of stock or goods sold, for which the purchase money has been paid, the measure of damages is the highest value of the thing sold at the time appointed for delivery, or time of trial, or at any intervening period. *Shepherd vs. Johnson*, 2 *East.*, 211. *McArthur vs.*

*Seaforth*, 2 *Taunt.*, 257. *Downes vs. Buck*, 1 *Stark.*, 251. *Gainsford vs. Carroll*, 2 *B. & C.*, 624. *Owens vs. Routh*, 25 *Eng. L. & E. Rep.*, 306. *Clarke vs. Pinney*, 7 *Cowan*, 681. *Rankin vs. McCullough*, 12 *Barb.*, 103.

Now, the condition of the bailor, whose stock is pledged for less than its value, is analogous to the case of a purchaser of stock who has advanced his purchase money. These cases are very different from that of a purchaser of stock to be paid for on delivery, who, on failure of the vendor to comply with his contract, may go into the market with his money and purchase other stock.

8th. The right to follow the stock carries with it the right to the dividends or fruits of that stock. If, then, in contemplation of law, the stock remained in the hands of the pledgee, and subject to redemption on the 16th of December, 1862, or on any subsequent day, the plaintiff ought to have recovered, in addition to the value of the principal stock, the amount of all dividends declared on that stock at any time prior to such day of conversion, and which were received, or, but for its own default, might have been received by the defendant.

The questions relating to the measure of damages are involved in both appeals. The question of recoupment is peculiar to the plaintiff's appeal.

9th. It will be insisted, that the *tortious* breaking up of the bailment, by the denial of the plaintiff's right of redemption and transfer of the stock to another, destroyed the lien and deprived the defendant of any right to recoupe the amount of the money loaned from the damages recovered by the plaintiff.

1. The lien of the pledgee is inseparable from the possession of the pledge. The pledgee, by surrendering or parting from the possession of the pledge, extinguishes his lien. The lien on the stock in question was, therefore, destroyed by the

transfer made by the defendant to other parties in the spring of 1862. *Sweet vs. Payne*, 1 *East.*, 4. *McCombis vs. Davis*, 7 *East.*, 5.

The lien did not pass with the stock to these transferrees. Hence, if the plaintiff had brought his action against them, he must have recovered in that action the full value of the stock, without discount or abatement on account of the debt due from the plaintiff to the original pledgee. *Shipley vs. Kymer*, 2 *M. & S.*, 29. But as a sale of personal property by a vendor in possession carries with it an implied warranty of title, the purchasers from the defendant might have a recovery over against the present defendant for the full sum recovered by the plaintiff against him. *Mairs vs. Taylor*, 40 *Penna.*, 446.

To prevent circuity of action, therefore, the measure of damages ought to be the same where the action is brought against the pledgee, as it would be where the action is against his transferee, else the aggrieved party would be tempted to waive his remedy against the wrong-doer, and proceed directly against an innocent purchaser from him.

Tender, demand and refusal, are said to be evidence of conversion. The pledgee in possession, under the bailment, is not bound to surrender the pledge, except on payment or tender of the debt secured by the pledge. But if he has tortiously converted the pledge the bailment is thereby broken up, and a tender is not necessary to perfect the cause of action of the pledgor.

The lien is, by the tortious conversion, destroyed. It is so expressly held where the party having a general lien which he cannot enforce by a sale, tortiously sells or parts with possession. *Seibel vs. Springfield*, 9 *L. T.* (*N. S.*) 324. *Johnson vs. Shae*, 3 *Am. Law Reg. N.* 8, 753. *Mark vs. Lawrence*, 5 *H. & J.*, 64.

And the same law must apply where the lien is special

and the sale or disposition is tortious. The rule is established to enforce the obligation of the bailment, and for the protection of the debtor. The debt is not discharged by the extinguishment of the lien, or even by the destruction of the pledge. But the pledgee, who has willfully broken up the bailment, shall not protect himself from responsibility by sheltering himself under a right which had its origin and continued existence in that bailment.

Nor is the recoupment to be claimed on the principle of discount or set-off. A debt is not to be set-off in an action on the case for damages. And there is nothing more than reciprocity in this. For if the creditor sues, as he may for recovery of the debt, the debtor cannot set-off in that action the value of the pledge or damages for its tortious conversion; and as the debtor shall not embarrass the creditor in his action for recovery of the debt, by tendering issues which concern the dealing of the creditor with respect to the pledge, neither shall the creditor seek to embarrass the debtor in his pursuit of damages for the tortious disposition of the pledge, by tendering issues which address themselves to the validity or amount of the debt. We say nothing of the right of the debtor to discount from the debt the proceeds realized by a valid sale of the pledge.

The only conceivable ground on which the pledgee can be permitted to set-off the debt against damages claimed for a tortious disposition of the pledge is, that *ex equo et bono*, the debtor obtaining full compensation for the wrong done to him ought not to decline payment of what is justly due from him to his creditor. "He who would have equity, must do equity." The maxim may be applicable, if we are to assume that the parties stand as they would stand in equity, and that the account is to be taken as it would be taken in equity. In equity, it is certain, that the debtor may require the creditor to restore the pledge specifically on receiving payment of the debt. The measure of damages ought, therefore, in

such case, to be the value of the pledge at the time of trial, with all its intermediate profits reduced by the debt, and interest thereon, to the same time.

BARTOL, J., delivered the opinion of this Court:

This suit was instituted by William F. Dalrymple against the Maryland Fire Insurance Company to recover damages for the alleged illegal sale and conversion, by the defendant, of three hundred and twenty-five shares of the capital stock of the Baltimore and Ohio Rail Road Company, which Dalrymple had pledged to the defendant to secure the re-payment of a sum of money loaned to him by the company.

The verdict and judgment of the Court below were in favor of Dalrymple. Both parties have appealed.

The *nar.* originally filed, contained a single count in *trover*; the defendant pleaded and issue was joined; afterwards an agreement was filed, that in lieu of formal pleadings the plaintiff should be considered as having amended his declaration by adding such counts *in tort* as the state of the facts, as they appear at the trial, would justify, and the same agreement as to pleas and replications and issues thereon. "The case to be tried on the pleadings as they now stand, all errors in pleading on both sides released, with leave to each party to give the special matter in evidence, reserving to each party, in case of appeal, the same benefit of exceptions as if formal pleadings had been put in."

As a material question upon the pleadings is raised by the fifth prayer of the defendant, it is necessary for us to interpret this agreement. The plaintiff's counsel, in their brief, state, that "all errors in pleading were released, the questions at issue are presented by the facts disclosed in the bill of exceptions and the instructions of the Court thereupon." This is not strictly correct. As we understand the agreement, the plaintiff in his amendments was confined to his counts in

33     V. 25.

*tort*, and the suit must be dealt with as an action *ex delicto*, and as if the supposed amended counts in that form were added.

With these preliminary remarks, we proceed to state the facts of the case as disclosed in the bill of exceptions. The terms of the pledge are shown by the receipt signed by the president of the company, dated the 12th day of June, 1860, and by Dalrymple's receipt, of the same date, given to the company; these papers correspond in their terms, and it is only necessary here to insert one of them. viz: that signed by the president of the company, and offered in evidence by the plaintiff; it is as follows:

"I have this day advanced to William F. Dalrymple the sum of nineteen thousand five hundred dollars, returnable upon one day's notice, and he has deposited in my hands as collateral security, for the payment of the same, the following securities, viz: three hundred and twenty-five shares of Baltimore and Ohio Rail Road stock, now in the name of E. Pratt & Brothers, but to be transferred this day to my name as the President of the Maryland Fire Insurance Company of Baltimore, with the understanding, that if the said loan is not promptly paid according to agreement, I am authorized, without further notice, to sell the said collaterals for the purpose of satisfying the same; any excess or deficiency to be paid or received by him as the case may be; a margin of ten dollars per share to be kept up at all times during the running of this contract.

Signed,              Thos. E. Hambleton,
                                          Pres't.

Endorsed,              *Baltimore, Aug.* 13, 1860.

Received interest on the within loan, $268.67, to this date."

The receipt or memorandum of loan signed by the plaintiff, by his agent, P. H. Coakley, contains, in addition, this memorandum, "interest payable every sixty days, should the same continue beyond that time."

Proof was offered by the defendant that the market price of the stock was, as follows:

On the 12th of June, 1860 $79 per share,
" " 30th of Oct., " $76½ " "
" " 5th of Nov., " $69 " "
" " 10th of " " $68 " "
" " 15th of " " $56½ " "

Evidence was given of calls made by the defendant on the plaintiff, viz: On the 30th of October, 1860, a notice to return the loan on the 1st of November, 1860. On the 5th of November, 1860, a notice to "deposit additional amount of securities or larger margin" on the loan. On the 10th of November, 1860 a notice "to return nine thousand dollars of the loan, on Tuesday, the 13th instant."

On the 13th of November, 1860, the following notice was given to the plaintiff's agent:

"Mr. P. H. Coakley, Agent.—Sir: On Saturday, the 10th inst., we notified you to return on this day nine thousand dollars, being part of the loan made to you the 12th of June last upon three hundred and twenty-five shares of the Baltimore and Ohio Rail Road stock; you have not complied with that call, and we now notify you to return to this company the whole of said loan, nineteen thousand five hundred dollars, on to-morrow, Wednesday, the 14th inst."

Signed, OTIS SPEAR, Sec'y.

By order of the Board.

It was admitted that these notices were received by the plaintiff on their respective dates. It was also proved and admitted that there were negotiations between the plaintiff and defendant about the 15th of November, 1860, in consequence of the notices, the object of the same being to relieve the loan; but they were ineffectual and had been terminated before the 20th of November, 1860.

On this last named day, the defendant procured the 325

shares of stock to be sold at the Board of Brokers, and became the purchaser thereof at $55 per share.

This sale and purchase were effected by the agency of brokers employed by the defendant, two of whom, Gildersleve and Whitridge, were employed to sell at the highest obtainable market price, and Whitridge testified that the stock was accordingly put up and sold at the public board for the highest market price of the day; he had likewise instructions from Mr. Wm. W. Spence to purchase said stock for him, Spence, at the market rate, and witness accordingly requested Mr. Edward Pittman, (another broker,) to purchase said stock for him, the witness, which was done. The sale was in all respects fair, and not covert in any particular; the witness requested Pittman to bid it in for him, because such is the usage of the board when the same broker has an order to buy and an order to sell the same lots of stocks from different parties, and in order that the sale might be recorded in the usual manner. The same broker cannot appear on the books as buyer and seller in the same transaction. No transfer was made to Pittman except on the books of the board; the stock was transferred to Spence next day and witness sent him the certificate. The same witness testified that Spence called at his office before the meeting of the board, on the day of sale, and informed witness, he knew witness had the stock for sale, and then instructed witness to buy for him. Witness did not know, till after the sale, that Mr. Spence was buying for the company. It was admitted by counsel, at the trial, that Spence was one of the directors of defendant, and made the purchase for the defendant.

It was admitted, that shortly after the sales of the 20th of November, 1860, an account was rendered to the plaintiff by the defendant charging the amount of loan and interest, and crediting the net proceeds of the sale, leaving a balance due defendant of $1,774.50, and payment thereof demanded.

The stock was held by the defendant till the spring of 1862, when it was sold in parcels to different persons, and on different days, between the 18th of March and the 1st of May, 1862, at prices ranging from $60 to $67 per share, yielding in the aggregate the sum of $19,943.75 net.

These sales were made publicly at the Board of Brokers—fairly and in the usual way—at the ruling market prices, by competent brokers employed for that purpose, and the stock was transferred to the several parties purchasing the same.

It was proved by the plaintiff and admitted, that a dividend of three per cent. ( $3 per share ) was declared on the stock and paid to the defendant on the 27th of October, 1860, and handed over to the plaintiff; that the defendant received a similar dividend on the 16th of April, 1861, and applied the same to its own use; also, that dividends to the same amount were declared on the same stock, payable on the 30th of May and 30th of September, 1862, and on the 31st of March, 1863; also, a dividend of six per cent. on the 26th of October, 1863, and a dividend of four per cent. on the 26th of April, 1864; but that the defendant received none of the said dividends except the first two above enumerated. It was further admitted that the plaintiff paid interest on the loan, in full, to November, 1st, 1860.

On the 16th day of December, 1862, the plaintiff tendered to the company the sum loaned, with interest, and demanded a return of the stock, to which the president of defendant replied, "that the said shares had been sold and were no longer in the defendant's possession," and declined to accept the tender.

Proof was offered (subject to exception) that at the time of the tender the stock was worth in the market about $78 per share, and that at the time of the trial it was worth about $115 per share. Proof was offered by the defendant that on the 20th of November, 1860, the stock was worth no

more than $55 per share, and between that day and the day of tender fluctuated in value, and on the 25th of April, 1861, was sold as low as $41.50 per share.

Upon this state of facts the plaintiff presented two prayers, and the defendant five prayers, these were all refused, and the Court below gave an instruction to the jury.

The propositions presented by the plaintiff's prayers were:

1st. That upon the tender, demand and refusal made in December, 1862, notwithstanding the previous sales of the stock, the plaintiff was entitled to recover; and in assessing the damages the jury might value the stock as worth the highest price which could be obtained for the same in the exchange market at the time of the trial, and that the defendant was chargeable with all dividends on the stock declared after the pledge and before the time of trial which, by reason of the pledge, the plaintiff was disabled from recovering, and which might have been realized by the defendant if it had kept the pledge.

2nd. If it should be found that the bailment had been determined, and the relation of pledgor and pledgee destroyed by the sale in November, 1860, or by those made in the spring of 1862, then that the defendant's lien on said stock, as a security, was thereby terminated, and no discount or *recoupment* from the value of the stock, to be ascertained as aforesaid, ought to be made for or on account of the money loaned by the defendant to the plaintiff.    The defendant's prayers asserts:

1st. That the sale of the 20th of November, 1860, if the jury find it was made *bona fide*, was valid and binding in law, and if the proceeds thereof did not amount to the principal and interest of the loan, the plaintiff was not entitled to recover.

2nd. That the sale of the 20th of November was not void, but voidable only by proper proceedings in a Court of Chancery, upon grounds not cognizable at law.

3rd. That if the plaintiff is entitled to recover, then the measure of damages is the market value of the stock on the 20th of November, 1860, deducting therefrom the amount of the loan and interest then due. (The theory of this prayer, is, that the sale and purchase of the stock made, on the 20th of November, 1860, was a conversion, and operated to break up the bailment.)

4th. If the first three prayers should be rejected, then that the sales and transfer of the stock made in the spring of 1862, operated as a conversion thereof, and the measure of damages is the market value of the stock at that time, together with the dividend actually received by the defendant, deducting therefrom the amount of the loan and interest then due.

5th. That the sales made in the spring of 1862 were legal and not tortious, and even if the jury should find the proceeds of such sales, together with the dividend received by the defendant, exceeded the amount of the loan and interest then due, the plaintiff is not entitled to recover such excess in this form of action.

The Court below seems to have considered the sales in 1860 and 1862 as wholly void and inoperative, and the bailment still continuing, and instructed the jury that upon proof of the pledge, and the tender, demand and refusal in December, 1862, the plaintiff was entitled to recover, and the measure of damages was the market value of the stock at that time, together with the dividend received by the defendant in April, 1861, deducting therefrom the amount of the loan and interest. Having thus stated the positions taken by the parties in their several prayers, and by the Court below in its instruction to the jury, we shall proceed to express, as briefly as we can, the judgment of this Court upon the questions involved, so far as they are deemed material to the decision of the case. In doing so, we shall confine ourselves mainly to a statement of the conclusions we have reached after a careful examination of all the authorities

cited in argument, without attempting to refer to them particularly, or to reconcile them where they may be in conflict. To do so, would require this opinion to be extended to very great length, without perhaps subserving any good purpose.

The first question that naturally presents itself for our consideration is the effect of the sale and purchase of the stock made by the defendant in November, 1860. By the terms of the contract, the loan was payable on one day's notice, and if not paid according to the agreement the defendant was authorized, *without further notice*, to sell the stock pledged for the purpose of satisfying the same. Unquestionably, the notice given on the 13th of November was sufficient, under the contract, to entitle the defendant to sell on the 20th.

In the absence of any express agreement to the contrary, it has been held in some cases to be necessary for a pledgee, before exercising the power of sale, to give notice to the pledgor of the time and place of sale. *Washburn vs. Pond,* and another, 2 *Allen (Mass.) Rep.,* 474; and the same rule was announced by the Superior Court of New York, in *Wheeler vs. Newbold,* 5 *Duer,* 29, and by the Court of Appeals in the same case. 2 *Smith,* (16 *N. Y. Rep.,*) 392.— Without expressing any opinion upon the law as laid down in those cases, it is clear it can have no application to a case where such notice is dispensed with by the contract of the parties. Here, by the words of the agreement authorizing the defendant upon default to sell without further notice, we understand that when the power to sell arose, all notice of the time and place of sale was waived and dispensed with by the plaintiff, leaving upon the defendant the obligation to sell publicly and fairly for the best price he could obtain.— See 2 *Kent's Com.,* 582, 583.

A sale at the Board of Brokers, publicly and fairly made, would, in our opinion, have been legal and valid, and if the

sale of the 20th of November had been made to a third person it would have been a legal sale under the contract, vesting a good title in the purchaser and terminating the bailment. It was contended by the plaintiff's counsel, that the sale must, in all cases, be made at public auction, and that a sale at the Brokers' Board would not be legal; and some decisions in New York were cited in support of this view.

In *Brown vs. Ward*, 3 *Duer*, 660, it was said, that "a custom has grown up, (in New York,) and been sanctioned by the Courts, of selling stock at the Merchant's Exchange."

There is no evidence of any such custom in Baltimore, and considering the requirements of the law, and the reason and nature of the transaction, we are of the opinion that the most proper and suitable place for a sale of stock is at the Board of Brokers. There is the stock market—the mart to which vendors and purchasers resort, by their agents, to buy and sell stock, where competition among bidders is most apt to be found—such sales are public, and unless there be, in the particular case, some ground for impeaching their fairness, we are of opinion they are reasonable and ought to be supported.

But, as we have seen, the defendant became itself the purchaser of the stock, and the question arises, what was the legal effect of the proceeding? Did it amount to a valid and effectual sale so as either to vest in the defendant, as purchaser, an absolute title, or to operate as a conversion of the property, break up the bailment, and the relation of bailor and bailee between the parties?

The doctrine, that trustees, executors, administrators and others, holding fiduciary relations, are incompetent to purchase the property held by them in trust, is well settled. See *Story's Eq. J.*, secs. 321, 322, 323, where the cases are collected. In section 323, the learned author says: "There are many other cases of persons standing in regard to each other, in like confidential relations, in which similar princi-

ples apply." Lord Chancellor Cottenham, in. *Greenlaw vs: King*, (5 *Lond. Jur.*, 18,) cited in *Torrey vs. Bank of Orleans*, 9 *Paige*, 663, held that "the principle was not confined to a particular class of persons, such as guardians, trustees or solicitors, but was a rule of universal application to all persons coming within the principle, which is that no party can be permitted to purchase an interest where he has a duty to perform inconsistent with the character of purchaser." See, also, 12 *Md. Rep.*, 384. 16 *Md. Rep.*, 456. 20 *Md. Rep.*, 117. This rule rests upon grounds of public policy, and is enforced without regard to the question of *bona fides* in the particular case. It is clear, both upon reason and authority, that the case of pledgor and pledgee comes within the rule.

In *Story on Bailments*, sec. 319, it is said: "In respect of sales, also, there is a salutary restraint upon the pawnee to secure his fidelity, and good faith that he can never become a purchaser at the sale. This rule will be found recognized equally in the common law and the Roman law."

It has been argued, on the part of the defendant, that this is a purely equitable doctrine, to be enforced only in Courts of Equity on grounds not cognizable at law; and while such sales are voidable in equity, they must be treated in this *forum* as valid.

This question is not free from difficulty, but the conclusion we have reached, from an examination of the cases, is clearly expressed in the third point of the plaintiff's brief.

While in cases of pure trust, where exclusive jurisdiction is in equity, resort must be had to that tribunal for relief; and sometimes, in cases of *quasi* trust, that court will grant relief where there are special circumstances requiring such interference, (as in *Hasbrouck vs. Vandervoort*, 4 *Saund. S. C. Rep.*, 74;) yet the relation of pledgor and pledgee, being a legal relation, its rights and duties are defined by law, and the remedies for violation of such duties are ordinarily in a Court of Law.

The sale of the pledge, by the defendant to itself, was contrary to the faith of the bailment, forbidden, as we have shown by the citation from Story, by the common law, and might be treated by the bailor, at his election, as a tortious conversion of the property. In this case, no such election was made by the plaintiff. There was no transmutation of title or change of possession, and the sale being inoperative to work a conversion, the relation of the parties remained unchanged thereby. The defendant remained in possession of the stock as before, in the same manner as if the sale had been attempted, and both, in fact and in contemplation of law, the bailment continued. This point was decided in *Middlesex Bank vs. Minot,* 4 *Met.,* 325. That decision was followed by the Supreme Court of Iowa in *The Bank vs. Dubuque R. R. Co.,* 8 *Clarke,* 277.

Looking at the reasoning upon which those decisions rest, and the rules and principles of the law governing contracts of this description, we are of opinion that the decision in 4 *Metcalf,* so far as this point is concerned, was correct. The sale of the 20th of November did not operate, either to vest the title in the defendant, as purchaser, or to work a conversion of the stock. The bailment continued, and if nothing more had been done subsequently, and the stock had remained in the defendant's possession, there can be no doubt that the tender and demand made on the 16th of December, 1862, would have been valid, and the refusal on the part of the defendant, at that time, would have given a good cause of action to the plaintiff. But it appears from the proof that before that time, in the spring of 1862, the defendant caused the stock to be sold publicly at the Board of Brokers, and it was transferred to the several purchasers. What was the effect of those sales? Having given notice to pay the loan in November, 1860, the defendant was not bound to keep the pledge; the attempted sale of the 20th of November being inoperative, and the plaintiff, continuing in default,

the power to sell, conferred by the contract, still continued, and was, in fact, executed by the sales made in 1862. As we have already said, no further notice was required by the contract, nor can any valid objection be made to the place and mode of sale, the same not being impeached on the ground of unfairness or bad faith. By those sales the bailment was ended, and being made, as we have said, in the lawful and valid exercise of the power of sale, there was no violation of the contract on the part of the defendant, or any tortious conversion of the stock, and, therefore, the plaintiff was not entitled to recover in this form of action; and the fifth prayer of the defendant ought to have been granted.

The sales and transfer of the stock made in 1862, being valid and legal, the plaintiff would have the right to recover in an action *ex contractu* any excess which might remain in the hands of the defendant arising from the proceeds of these sales, including the dividend received on the 16th of April, 1861, with which the defendant would be chargeable, after deducting the amount of the loan and interest due at that time; such excess would be simply money had and received by the defendant to the use of the plaintiff, under and in conformity with the contract; even if the sales had been tortious, we entertain the opinion that the true measure of damages would be as stated in the defendant's fourth prayer, which asserts the right of the defendant to recoupe from the damages the amount of the debt; but that question does not arise in this case; the sales not being tortious, there could be no question of the right of the defendant to retain, out of the sums which came to its hands, the amount of the loan and interest; and even in a proper form of action the excess only could be recovered. But the question arising upon the pleadings is not of any practical importance in this case, because it is evident from a simple calculation that the money which actually came to the defendant's hands, from the sales of the stock and the dividend of April, 1861, was less than the debt

and interest due, and nothing, therefore, could be recovered by the plaintiff in any form of action.

The conclusion from this opinion is that there was no error in rejecting the plaintiff's prayers, and the first, second, third and fourth prayers of the defendant. But the Court below erred in rejecting the fifth prayer of the defendant, and in the instruction given to the jury; the judgment will, therefore, be reversed on the defendant's appeal.

*Judgment reversed.*

(Decided June 28th, 1866.)