## Case No. 9,122.
### MARSH v. WHITMORE.
#### [1 Hask. 391.] [1]
#### Circuit Court, D. Maine. Feb., 1872.[2]

PLEADING IN EQUITY — WEIGHT OF ANSWER — PLEDGE BONDS—SALE AT AUCTION — PURCHASE BY PLEDGEE—VOIDABLE—LACHES — NEGLECT BY ATTORNEY—INDEMNITY.

1. The answer to a bill in equity, so far as responsive, is to be taken as true, unless disproved by evidence of greater weight than the testimony of a single witness.

2. Bonds, pledged as security for liability incurred by the pledgee, cannot be purchased by him, even though they are sold at public auction.

3. Bonds, purchased by the pledgee at such sale, may be redeemed by the pledgor at his pleasure within a reasonable time.

4. Such purchase is voidable by the pledgor, and not absolutely void.

5. The pledgor, having knowledge of all the circumstances of the sale, after the lapse of eleven years is barred in equity from avoiding the sale by his own laches.

6. If such pledgor would avoid the effect of each lapse of time in equity, on the ground of concealed fraud, he must set forth in his bill with particularity, when and by what means the fraud was discovered.

7. Neglect, by an attorney at law of his duty in collecting demands left with him for collection, is not a subject of equity jurisdiction, as the parties have a full and complete remedy at law.

8. An officer has a right to require indemnity from the plaintiff before he is compelled to attach property of the debtor.

9. An attorney at law is justified in acting according to the decision of the supreme court of a state, although it be afterwards reversed by the supreme court of the United States.

In equity. Bill by a pledgor [George S. Marsh], charging that the respondent [Nathaniel W. Whitmore] fraudulently converted to his own use bonds given him as a pledge, and asking that he account for the same. The answer denied all fraud, and alleged that the bonds were lawfully sold and applied to the payment of the pledgor's debt, the payment of which they were pledged to secure.

Hanno W. Gage, A. G. Stinchfield, and Sewall C. Strout, for orator.

Artemas Libbey, for respondent.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

[2] [Affirmed in 21 Wall. (88 U. S.) 178.]

FOX, District Judge. The rule being well established in equity, that all the allegations of the answer, which are responsive to the bill, shall be taken as true, unless they are disproved by evidence of greater weight than the testimony of a single witness, it becomes important to compare the bill and answer to ascertain how far the latter is to be deemed evidence in the case, as the only evidence produced by the complainant in support of his bill is his own testimony, and some few exhibits which are not very material.

The bill was filed March 12, 1869, and charges, that in 1855 the complainant owned $6,500 of bonds of the Kennebec and Portland Railroad, issued in October, 1852, and $2,000 of notes of said corporation; that being indebted to certain parties in the state of Maine, he retained the respondent, a counsellor at law, as his counsel and attorney to effect a compromise with his creditors, the respondent agreeing to advance money for that purpose, if the complainant would entrust and deliver to him the bonds and notes as security and indemnity for his advances and a fair and reasonable compensation for his services; that confiding in the respondent as his counsel and agent, he delivered to him the bonds and notes, who received the same upon the trust aforesaid, and agreed not to sell or dispose of said securities without complainant's consent, and not to claim or demand thereof more than was fair or sufficient to fully indemnify him for his advances and services, and when indemnified, to return to complainant on demand so much and such parts thereof as were not necessary to indemnify him; that at the time the securities were delivered to Whitmore, complainant instructed him to sue the notes and attach certain personal property of the corporation pointed out by complainant, and if not thus paid to collect the same from the stockholders who were personally liable, and that Whitmore agreed to attend diligently to the collection of the same. The bill further charges as follows:

"That on or about the first day of October, A. D. 1856, at said Gardiner, your orator not consenting thereto, the said Whitmore, in violation of said trust and of his duty as counsel, attorney, and agent of your orator as aforesaid, caused said bonds to be sold at auction.

"And your orator further shows unto your honors that the said Whitmore, as well before as after said sale, pretended and represented to your orator that he had expended large sums of money and incurred great expense for and on account of your orator in the premises, and that his said advances and services, together with the amount due and owing him for his said advances to your orator, greatly exceeded the fair value of said securities entrusted to him as aforesaid; that the sale of said bonds as aforesaid was a bona fide sale

after due and sufficient notice and advertisement thereof; that said bonds brought all they were fairly worth in the market; that the purchaser was a bona fide purchaser thereof at said sale; that said notes were of no value and were not collectible of said company or of the stockholders of said company, and that your orator was largely indebted to him for his said advances and services after he had fairly and faithfully realized out of said securities so entrusted to him, all they were fairly worth; and your orator confiding in him as his counsel, attorney, and agent as aforesaid, believed such representations to be true.

"And your orator is now informed and believes and charges, that the amount due and owing the said Whitmore by your orator, for his said advances to your orator and on his account, and for services rendered as aforesaid, was the sum of twenty-five hundred dollars or thereabouts, and no more; that the representation of the said Whitmore, that there was due him from your orator a much larger sum than said securities were fairly worth, or than could be fairly realized therefrom, were and are untrue; that the sale of said bonds as aforesaid was not a bona fide sale upon due notice and sufficient advertisement thereof; that Robert Thompson, who attended said sale and became the purchaser of said bonds, did so by the procurement of said Whitmore; that said Thompson bid in said bonds not for himself or on his own account, but for and on account of said Whitmore, and for much less than the real value therefor, viz.: for and at the rate of five cents on a dollar or thereabouts, as your orator is informed and believes; that the said bonds were never delivered to the said Thompson after said pretended sale, and he paid nothing therefor; that said bonds were at the time of the sale and representations aforesaid, as the said Whitmore well knew, of the fair value of $6,500 or thereabouts, and said sale was so made in order to deceive, defraud, and injure your orator in the premises, and for the purpose of defeating and extinguishing said trust and your orator's right to reclaim and redeem said securities, and that said Whitmore might obtain the title to the same for much less than the real value thereof; that said notes were at the time they were received by said Whitmore and long afterwards collectible of said company and of the stockholders of said company, as the said Whitmore well knew; and that if said notes had not been collected by said Whitmore, the failure to collect them is attributable solely to his gross neglect, by reason whereof he has become and is justly chargeable with the full amount of said notes and interest thereon.

"And your orator further alleges, that he did not, until lately, by reason of the fraudulent concealments of said Whitmore in the premises, come to a knowledge of the matters and things alleged; that he was ignorant touching the fraudulent conduct and practices of said Whitmore; and that he was wholly ignorant of his rights in this regard, or that he could have redress at law or in equity touching the premises, and remained so till he had consulted counsel and been advised just previous to filing this bill of complaint; that within two years he had demanded of said Whitmore an account of said trust property and of the amount received by him on account of the same which he unreasonably neglected and refused to render.

"Wherefore he prays, that he may be required to make full, true and direct answer to all and singular the matters therein before stated and charged, and also to the several interrogatories thereunder written, and that he may be required to account, &c., and surrender the stock received by him in exchange for said bonds, or pay the value thereof in money, &c."

The second specific interrogatory contained in the bill is:

"Whether you caused said bonds or notes to be sold at auction about October 1, 1856, and what advertisement of such sale you gave? Whether they were bid in by one Robert Thompson, and if so, whether he purchased for himself and on his own account, or for you and your account. Whether you delivered the same to him after said sale, and at what price were they struck off to him? If not bid in by said Thompson, then by whom and for how much?"

And the fifth is:

"Whether you represented to the plaintiff after the sale of said bonds, that you had made such sale at public auction after duly advertising the same, and such sale was bona fide?"

The respondent in his answer admits he was an attorney at law, but denies that he was ever employed by the complainant as his attorney or agent, or in any capacity to adjust and compromise his liabilities with his creditors, and avers:

"That he never undertook to effect such a compromise, or to advance money for that purpose, and that the bonds and notes mentioned in the bill were not entrusted to him for any such purpose as is alleged in the bill; but that it is true, that on July 13, 1855, he did receive of the complainant $6,500 of the bonds to secure H. W. Paine and himself against any and all liabilities which they or either of them had or might incur for or on account of said complainant, and especially to secure the payment of three notes of that date, given by complainant to respondent, and amounting to $3,481.57, and also to secure the payment of a note of $90 given by complainant to C. Danforth on which said Whitmore was surety.

"That complainant never paid either of said notes, although repeatedly urged so to do, and that Aug. 27, 1856, he and Paine notified complainant that the bonds would

be sold at auction Oct. 1, 1856, at Gardiner, if the notes were not paid, but at the earnest solicitation of complainant and his promise that he would soon adjust the whole matter, the sale was waived; that complainant paid no further attention to the matter, and on March 20, 1857, respondent notified him he should sell the bonds on the 4th of April, but hoping that the matter might be adjusted the sale was again waived till May 26, 1857, when he advertised the bonds for sale June 20, 1857, at ten o'clock, at the Gardiner Hotel, and notified the complainant in writing of the time and place of sale, and the complainant replied in writing that the respondent must do with said bonds what he thought was best for all concerned, and he fully believed it was best then to sell the same.

"That notice of the sale was published three weeks successively in the Saturday Evening Transcript, a paper published in Gardiner; that he sold $4,500 of said bonds at auction at the time and place appointed for $950, when the sale was adjourned by the auctioneer to the 23d day of said June, at the same place, when the balance of said bonds, being $2,000, were sold at auction for $410.

"That $500 of said bonds were purchased by E. A. Chadwick for $100.50, and $1,000 by W. L. Lewis for $204, and the balance was purchased by the respondent, and immediately after said sale, he sent said Marsh the auctioneer's account of the sale, containing the names of the purchasers and the prices paid, and endorsed the proceeds of said sale on the said notes of the complainant. That the respondent afterwards bought of said Chadwick and Lewis the bonds purchased by them, at the same prices they were sold for, and that the prices for which said bonds sold were the full and fair value of said bonds at that time, and more than he could get offered him at private sale, on enquiry for a purchaser.

"That after that, in 1858 and 1859, said bonds of said railroad depreciated in value so that they sold in the market at ten dollars on the hundred and thereabouts. That in 1858 he sought an interview with the complainant at Augusta in this state, for the purpose of trying to get a full settlement of his matters with him, and the complainant then stated to him that he received the account of the sales sent him by respondent. That he then represented to the complainant that there was considerable due him over and above the proceeds of said bonds and his securities, and urged him to pay, saying to him, that though he was not the owner of the bonds, he could get them, and would do so and give up all if he would pay, but the complainant answered, in substance, that he did not think the bonds worth so much as they sold for, that he must keep what respondent had got, and if complainant ever got able he would pay the balance.

"That he was never guilty of any fraudulent practices towards the complainant in any way, nor did he in any way conceal any facts in regard to the premises from the complainant, but on the contrary, the sale of said bonds was fair, in good faith, after due notice, made for the purpose of realizing the most possible for the complainant from the same, and when they were depreciating in the market, and continued to do so for some years after, till they were worth but half as much as they were sold for at the sale; that all the facts were fully stated to the complainant and he fully approved and ratified the proceedings in regard to the sale of said bonds, and he submits, that if he had not so ratified and approved said proceedings, he has been guilty of such laches, after having a full knowledge of the facts, that he is not entitled to the relief prayed for in his bill of complaint."

To the second interrogatory propounded to him the respondent makes answer:

"He did cause the bonds to be advertised and sold, as is fully set forth in the answer. * * * The complainant was personally notified as early as the first day of June, 1857, or thereabouts, of the time and place of sale. Robert Thompson was not the purchaser of any of the bonds. The names of the purchasers and the prices for which they sold are hereinbefore fully specified."

The main groundwork of the bill is an alleged sale of these bonds by the respondent in violation of his duty as trustee, and a purchase of them by himself, through the intervention of one Thompson, in fraud of complainant's rights, of which acts of the respondent the complainant avers he had no knowledge by reason of the fraudulent concealment of Whitmore, till a short time before the suit was instituted. These matters are charged with fullness and particularity, and the respondent is called upon to make full, true, and direct answer thereto.

In his answer, the respondent denies that any fraudulent practices were committed by him in the sale, but states, that the sale was at public auction after due notice to complainant; that the larger portion of the bonds were bid in by the respondent, and the balance by Chadwick & Lewis, from whom the respondent purchased them at the prices they were sold for at the auction; that the full cash value of the bonds was then realized, viz.: about twenty per cent. and that in a year they fell to ten per cent.

To that portion of the bill which alleges complainant had no notice of the sale, and that respondent was the purchaser, he answers, that immediately after the sale he sent complainant the auctioneer's account of the sale, containing the names of the purchasers and the prices at which the bonds sold, which account the next year at Augusta complainant acknowledged the receipt of.

The complainant in his bill sets forth statements made to him by the respondent,

"that the sale was bona fide, after due and sufficient notice and advertisement thereof; that said bonds brought all they were fairly worth in the market; that the purchaser was a bona fide purchaser thereof;" and also propounds to him interrogatory five on the same subject.

The respondent was thus called upon not only to answer the specific interrogatory, but also the allegations in the bill as to statements and admissions made by him on this matter. In reply thereto he states, that at Augusta in 1858 the complainant admitted he had received the account of sales sent him by respondent, and that respondent told him there was considerable due on the notes over and beyond the proceeds of said bonds, and that though he was not the owner of the bonds he could get them, and would do so, and give up all if he would pay; but that complainant replied that he did not think the bonds worth so much as they sold for and that respondent must keep what he got, and if he ever got able he would pay the balance.

To the fifth specific interrogatory respondent's reply is:

"I did after said sale send to the complainant the auctioneer's account of the sale, giving names of purchasers and prices for which the bonds sold, and afterwards, at the interview in Augusta, in 1858, I did state to the complainant, in substance, but not in the precise words, that I made the sale at auction after duly advertising the same, and that the sale was a good sale. I did not, to my recollection, use the words bona fide. I then stated to the complainant the gross amount of the sale and that it had been applied on the notes."

The court is of opinion that the answer is so far responsive to the charges and substance of the bill as to be evidence in behalf of the respondent, and to prove that the bonds were sold at public auction after due notice to complainant and advertisement in the public prints, and that soon after the sale the complainant had full information as to the prices realized and by whom the bonds were purchased. Is this evidence overcome by satisfactory evidence of the witnesses, or by the testimony of one witness corroborated by facts and circumstances which give it greater weight than the answer?

All the testimony in contradiction of the answer is found in the complainant's deposition; and in that he does state that the first he knew of the bonds being bid in by respondent was in 1869, and that he had a conversation with him a few years before, and he then said, he had no interest in the bonds, and that it was a bona fide sale. But to the seventh cross interrogatory which is: "State whether the respondent met you in the court house in Augusta in 1858 and explained to you the sale of the bonds and the situation of the notes, and what you said to him, if anything?" He answers: "I have some faint recollection of meeting him some time, but can't say when or where. The substance of the conversation I cannot recollect." This answer certainly does not afford much support to the statements found in his bill, which was sworn to by him March 9, 1869, and which purports to give with some detail the admissions made to him by the respondent. The complainant does not present himself as a witness in all respects worthy of entire reliance and confidence as to the truth and accuracy of his statements. The averments made by him in his bill as to the motives and purpose of this pledge of these securities is most clearly shown by the receipt given at the time to be erroneous, and that, on the contrary, the respondent's statement in his answer upon this point is true and correct; and it is equally manifest that the complainant must have been aware, prior to 1869, that the bonds were bid in by respondent, as the bill was filed in March, 1869, and the demand for an account was made by his attorney on the respondent on the 7th of the preceding January, while in his bill he states that he did not until lately come to a knowledge of these matters, and that within two years of the filing of the bill he had demanded an account of his trust from the respondent.

The evidence produced by the complainant is not sufficient, in the opinion of the court, to overcome the effect of the answer according to the well-established rules in equity.

Two causes of action are set forth in the complainant's bill; one on account of the bonds, and the other on account of the notes; and although the bill charges that both bonds and notes were at the same time pledged to the respondent, it is quite certain that such was not the case. The memorandum given July 13, 1855, at the time the bonds were deposited with respondent, does not mention the notes, and the answer states that they were not received by respondent until the next year. "They were left with him for collection with authority to retain them as security for his claims on the complainant;" and the bill charges that "the complainant pointed out certain personal property of the corporation, which he directed to be attached, and if the notes were not thus paid, to proceed against the stockholders on their personal liability, and that if the same are not collected, it has been owing to the gross neglect and willful default of said Whitmore."

This abstract from the bill demonstrates that so far as any claim is made against the respondent on account of the notes, it is solely founded on the neglect of his duty as an attorney at law. There is no charge of any fraud in this respect, but the whole gravamen is neglect; and this portion of the bill is nothing more than inserting in a bill in equity a count in case for neglect of duty as an attorney at law, in collection of demands entrusted to him for that purpose. A full and

complete remedy at law exists, and may be had by complainant, if the facts would sustain such a suit, and it is clear that this court, as a court of equity, should not sanction such an attempt to confound the jurisdiction of the courts.

It is equally clear on the evidence, that the respondent has not been guilty of any negligence in this behalf. From his letter of March 20, 1856, to complainant, it appears "that the officer would not attach the property unless he had a bond of indemnity," which security he had a right to require, and it was the complainant's duty to furnish, if he desired the attachment to be made. It is shown by the testimony of Mr. Bradbury, "that the corporation failed and became insolvent in the latter part of 1855, and has continued insolvent ever since, and that all its property, so far as he knew, was covered by mortgages; that he had many demands in his office for collection which he was unable to collect or secure, could discover no means of securing them, and that in a suit against the stockholders, the supreme court of Maine held they were not liable." This decision was made in 1858, and was almost universally acquiesced in by the profession. Hundreds of actions were decided in accordance with it, and it was not until December, 1864, that the decision was reversed by the supreme court of the United States. An attorney certainly cannot be chargeable with negligence, when he accepts as a correct exposition of the law, a solemn decision of the supreme court of the state.

The memorandum of July 13, 1855, shows, that the bonds were deposited with Whitmore to secure to him the payment of complainant's notes and the note to Danforth, on which Whitmore was surety, and that "the coupons of said bonds may be applied by Whitmore towards said notes." The notes were not paid at maturity, and payment was repeatedly demanded without avail until the bonds were sold at public auction after notice to the complainant. The full market value of the bonds was realized, but the respondent himself purchased $5,000 of the amount at the sale, and was recognized as the purchaser by the auctioneer, and $1,500 were bid off by other parties from whom the respondent purchased them at the price they were sold for at auction. It does not appear that those parties at the sale acted in behalf of, or by any understanding with Whitmore, although it may be inferred such was the case from their subsequent dealings with the bonds.

It is quite clear that a pawnee cannot become the purchaser of the property pledged, even when sold at public auction. The law imposes upon him this restraint to insure good faith and fidelity on his part. This rule has been recognized both by American and Roman law. Story, Bailm. § 319; Maryland Fire Ins. Co. v. Dalrymple. 25 Md. 242; Middlesex Bank v. Minot, 4 Metc. [Mass.] 325.

The sale therefore was tortious and invalid as against the complainant, and it depended on his election whether it should become operative. It was voidable by him, but not absolutely void. The complainant was fully advised of the names of the purchasers and of the amount for which the bonds sold as early as July, 1857. The bonds continued to depreciate in the market until the next year, when they would not have produced more than half the amount for which they had been sold. In 1863 the complainant himself sold some of the same class of bonds for thirty per cent. flat, and Mr. Bradbury states that he received some from him at that rate in payment of his account. It was not until January, 1869, that the complainant made any claim to the bonds. or that the respondent was in any way accountable to him for any breach of contract or misconduct in relation to them.

The complainant, after full knowledge of all that had been done by respondent, acquiesced, and by his silence, sanctioned and adopted the proceedings of the respondent for more than eleven years, during which time there had been great changes in the value of these securities, falling fifty per cent. below the amount for which he had been credited on his notes, and subsequently rising in value till they are said to be worth nearly their face.

Will a court of equity sanction such silence and delay, and allow a party thus to reap so large a benefit from his remissness? The court cannot but be of opinion that it was the duty of the party, when fully advised of what had been done, in some way within six years at least, to have communicated to the respondent his disaffirmance of his conduct, and to have notified him that he should insist on his rights; and that after so long a time. and such great changes in the value of the property, it is not consistent with the principles which guide courts of equity, to permit him to repudiate the transaction at so late a day. If he could repudiate it after a sleep of eleven years, under full knowledge of the wrong inflicted upon him, there would seem to be no limit or restraint which could be imposed upon him or his representative in case of his decease. In Doggett v. Emerson [Case No. 3,960], Judge Story says: "Lapse of time in many cases is a most important consideration and weighs much, and sometimes, est maximi et momenti ponderis, especially when there has been a great change of circumstances as to the character and value of the property in the intermediate period; and a fortiori where the party complaining has been fairly put on his diligence, and has had ample means of inquiring as to all the material facts, and has chosen to lie by in gross indifference and indolence." See, also, Hough v. Richardson [Id. 6,722].

"There is a defence peculiar to courts of equity, founded on lapse of time and the staleness of the claim, where no statute of limita-

tions governs the case. In such cases, courts of equity often act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights." Story, Eq. Jur. § 1520, approved by the supreme court of the United States, in Wagner v. Baird, 7 How. [48 U. S.] 258; Badger v. Badger, 2 Wall [69 U. S.] 94; Id. [Case No. 718.] The statute of limitations is not pleaded in the case at bar, but laches is relied on and distinctly set forth as matter of defence in the answer, and in the opinion of the court the complainant is clearly chargeable with such neglect of his rights as to bar him of all claim to redress, which otherwise he might have been entitled to.

The complainant avers that he "did not, until lately, by reason of the fraudulent concealments of said Whitmore in the premises, come to a knowledge of the several matters and things hereinbefore alleged," but he does not state when or by what means the fraud was discovered. Such general and unsubstantial allegations of excuse cannot be regarded by a court of equity as sufficient. On the contrary, it is well settled that if the complainant would avoid the effect of lapse of time, or the statute of limitations, on the ground of concealed fraud, he must set forth with particularity when and by what means the fraud was discovered, and the averment so made must be supported by proof. Badger v. Badger, supra. In New Albany v. Burke, 11 Wall. [78 U. S.] 107, the same length of time had elapsed since the transaction had taken place, and the court says, "No excuse is therefore shown for the long delay, and it is difficult to see why they are not barred by the rule in equity analogous to the statute of limitations."

At the hearing, objection was taken that Paine should have been joined as a party respondent. This objection, under the circumstances, does not appear to have been made seasonably, as the case was allowed to come to argument before it was presented. It was admitted that Paine was a citizen of Massachusetts at the time the bill was filed, and it was shown that he never actually received the bonds, or in any way took any control over the same. It did not appear that he had made any advances or incurred any liabilities on account of the bonds, or that he had any claim or right of any kind to the same, or had ever asserted such right, and that the bonds were retained and held by the respondent, and by him disposed of, and that the proceeds had been by him applied toward the satisfaction of the liabilities of the complainant. If he had any reason to suppose that Paine had any interest to be affected by the decree, we think he should, in an earlier stage, have made known his claim and brought it to the knowledge of the court. The bill asks for relief only against the proceed-

ings and dealings of the respondent with the bonds, and makes no claim that Paine has in any way wronged or injured the complainant; and although Paine might properly have been made a party, we do not think that it was necessary that he should be a party in order to have done full justice between the complainant and respondent. If the case could have been sustained on its merits, the case of Story v. Livingston, 13 Pet. [38 U. S.] 359, fully sustains this view of the objection. See, also, 1 Daniell, Ch. Prac. 285.

Bill dismissed, with costs.

[The decree dismissing the bill was affirmed upon appeal to the supreme court. Mr. Justice Field delivered the opinion. 21 Wall. (88 U. S.) 178.]